# EXHIBIT A

# Attachment 'A'

## UNITED STATES DISTRICT COURT
### DISTRICT OF COLORADO
### PROBATION OFFICE

**Elizabeth Russell**
Chief U.S. Probation Officer

Byron G. Rogers U.S. Courthouse
1929 Stout Street, Suite C-120
Denver, CO 80294-0101
Phone: (303) 844-5424

212 North Wahsatch Avenue, Suite 300
Colorado Springs, CO 80903-3476
Phone: (719) 471-3387

**Kyla Hamilton**
Deputy Chief U.S. Probation Officer

400 Rood Avenue, Room 309
Grand Junction, CO 81501-2520
Phone: (970) 245-5396

103 Sheppard Drive, Suite 206
Durango, CO 81303-3439
Phone: (970) 385-9564

March 3, 2022

RESPOND TO:    Denver

Case Manager K. Jackson
FCI Talladega
565 East Renfroe Road
Talladega, AL 35160

Re:    Charles Harrison **BARBEE**
Register No.: 09032-085
**Conditional Prerelease/Relocation Approval**

Dear Case Manager Jackson,

This letter is in response to the defendant's request in which he proposes to reside with his daughter, Milica Lattanzie, at 5017 W. 12th Street Drive, Greeley, Colorado.

I spoke with Mrs. Lattanzie on January 14, 2022, in which she advised the defendant is welcome to release to her residence in Greeley, Colorado. On February 24, 2022, a home inspection was conducted. The residence is a ranch-style house with a finished basement, the main level is comprised of a living room, kitchen, laundry room, two bedrooms, and two bathrooms. The basement is comprised of a living room, two bedrooms, one bathroom, and utility room. The house has an attached two car garage, and the backyard has a large storage shed. There were firearms present in the master bedroom closet, during the home inspection, but Ms. Lattanzie agreed to remove these from the residence, if the defendant is permitted to reside in her home. The home is well-kept, and no further contraband was observed during the home inspection. Mrs. Lattanzie appears willing to be supportive of the defendant when he releases to the community and to provide a prosocial living environment.

Given the above information, the defendant's release plan is conditionally **approved**. The defendant needs additional conditions of supervised release prior to full approval. The defendant must agree to a modification of his supervised release to include the additional six special conditions:

1. If the judgment imposes a financial penalty/restitution, you must pay the financial penalty/restitution in accordance with the Schedule of Payments sheet of this judgment. You must also notify the court of any changes in economic circumstances that might affect your ability to pay the financial penalty/restitution.

2. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence.

3.  You must provide the probation officer access to any requested financial information and authorize the release of any financial information until all financial obligations imposed by the court are paid in full.

4.  You must apply any monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation in this case.

5.  If you have an outstanding financial obligation, the probation office may share any financial or employment documentation relevant to you with the Asset Recovery Division of the United States Attorney's Office to assist in the collection of the obligation.

6.  You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

Should the defendant agree to the recommended modifications of his conditions, the relocation plan would be approved. If you have any questions, feel free to contact me at 720-401-3788.

Sincerely,

*s/Maravilla Fontes*
Maravilla Fontes
U.S. Probation Officer

APPROVED:   *s/Gary W. Phillips*
Gary W. Phillips
Supervisory U.S. Probation Officer

cc: Matt Thompson, CUSPO
    Eastern District of Washington

# EXHIBIT B



### Individualized Needs Plan - Program Review    (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

SEQUENCE: 00739182
Team Date: 08-24-2022

Plan is for inmate: BARBEE, CHARLES HARRISON  09032-085

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| FLP | C | HEALTH & NUTRITION | 05-07-2002 | 07-07-2002 |
| FLP | C | ACE COLLEGE ALGEBRA | 01-21-2001 | 08-07-2001 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 01-27-2005 |
| CARE1-MH | CARE1-MENTAL HEALTH | 07-06-2010 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| REG DUTY | NO MEDICAL RESTR–REGULAR DUTY | 03-08-1999 |
| YES F/S | CLEARED FOR FOOD SERVICE | 03-08-1999 |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED NONE | DRUG EDUCATION NONE | 04-06-2011 |

### FRP Payment Plan

| Most Recent Payment Plan |
|---|

**FRP Assignment:    PART    FINANC RESP-PARTICIPATES    Start: 03-29-2017**

| Inmate Decision: **AGREED    50%** | Frequency: **MONTHLY** |
|---|---|
| Payments past 6 months:    **$1,033.62** | Obligation Balance: **$207,707.25** |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $1,000.00 | $875.00 | IMMEDIATE | EXPIRED |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 2 | REST NV | $214,340.83 | $207,707.25 | IMMEDIATE | AGREED |

| Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|
| | 08-11-2022 | TDG | PAYMENT | INSIDE PMT | $253.52 |
| | 07-12-2022 | TDG | PAYMENT | INSIDE PMT | $238.76 |
| | 06-14-2022 | TDG | PAYMENT | INSIDE PMT | $142.17 |
| | 05-12-2022 | TDG | PAYMENT | INSIDE PMT | $211.68 |
| | 04-12-2022 | TDG | PAYMENT | INSIDE PMT | $131.13 |
| | 03-10-2022 | TDG | PAYMENT | INSIDE PMT | $56.36 |

### FRP Deposits

Trust Fund Deposits - Past 6 months:   $2,167.28        Payments commensurate ?   Y

New Payment Plan:   ** No data **

### Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 04-27-2021 |
| INELIG AUT | FTC-INELIGIBLE OFF CODE - AUTO | 12-17-2019 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 08-23-2022 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 08-23-2022 |
| N-COGNTV N | NEED - COGNITIONS NO | 08-23-2022 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-30-2021 |
| N-EDUC N | NEED - EDUCATION NO | 08-23-2022 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 08-23-2022 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 08-23-2022 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 08-23-2022 |
| N-MEDICL N | NEED - MEDICAL NO | 08-23-2022 |
| N-RLF N | NEED - REC/LEISURE/FITNESS NO | 08-23-2022 |



## Individualized Needs Plan - Program Review    (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: BARBEE, CHARLES HARRISON  09032-085

SEQUENCE: 00739182

Team Date: 08-24-2022

| Assignment | Description | Start |
|---|---|---|
| N-SUB AB Y | NEED - SUBSTANCE ABUSE YES | 08-23-2022 |
| N-TRAUMA N | NEED - TRAUMA NO | 08-23-2022 |
| N-WORK N | NEED - WORK NO | 08-23-2022 |
| R-MIN | MINIMUM RISK RECIDIVISM LEVEL | 08-23-2022 |

**Progress since last review**

He is still working in Unicor. He is currently participating in the Inmate Financial Responsibility program and is making all monthly payments. He has continue to maintained a clear disciplinary record since last review. He is still on the waiting list for the career readiness classes. He did not complete the money market class, will not make recommendation again. He is currently participating in the threshold class.

**Next Program Review Goals**

Recommend to complete the threshold class by next review.

**Long Term Goals**

Recommended to enroll in a VT course such as HVAC or Welding by January 2029. Recommend to obtain birth certificate, social and identification cards by same date.

**RRC/HC Placement**

No.
Management decision - Not within the required time frame.

**Comments**

GCT release date 12-06-2043



| **Individualized Needs Plan - Program Review    (Inmate Copy)** | SEQUENCE: 00739182 |
|---|---|
| Dept. of Justice / Federal Bureau of Prisons | Team Date: 08-24-2022 |
| Plan is for inmate: BARBEE, CHARLES HARRISON  09032-085 | |

| | | | |
|---|---|---|---|
| Facility: | TDG  TALLADEGA FCI | Proj. Rel. Date: | 12-06-2043 |
| Name: | BARBEE, CHARLES HARRISON | Proj. Rel. Mthd: | GOOD CONDUCT TIME |
| Register No.: | 09032-085 | DNA Status: | JES04043 / 03-04-2011 |
| Age: | 70 | | |
| Date of Birth: | 03-02-1952 | | |

**Detainers**

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| TDG | U FACT OFF | FACTORY OFFICE X 192 | 05-18-2021 |

**Current Education Information**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| TDG | ESL HAS | ENGLISH PROFICIENT | 01-23-1998 |
| TDG | GED HAS | COMPLETED GED OR HS DIPLOMA | 04-19-1999 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| TDG | C | WALKING WITH EASE - FSA | 01-06-2022 | 02-17-2022 |
| TDG | C | RPP1 AIDS AWARENESS | 05-12-2021 | 05-12-2021 |
| TDG | C | RPP1 AIDS AWARENESS | 02-01-2018 | 02-01-2018 |
| LEE | C | (D) PLANNING & CONTROL BUDGETS | 07-02-2014 | 07-08-2014 |
| LEE | C | OASIS-FINANCIAL PERFORMANCE | 07-02-2014 | 07-08-2014 |
| LEE | C | OASIS-FINANCIAL BASICS | 07-02-2014 | 07-08-2014 |
| LEE | C | (D)PERSONAL FINANCE-CAI | 01-19-2014 | 03-31-2014 |
| LEE | C | (G)CRITICAL THINKING-CAI | 01-19-2014 | 03-31-2014 |
| LEE | C | INDUSTRIAL SEWING (UNICOR) | 09-10-2013 | 10-21-2013 |
| LEE | C | RPP5 RPP ORIENTATION | 12-11-2012 | 12-11-2012 |
| LEE | C | RPP1 AIDS AWARENESS | 12-11-2012 | 12-11-2012 |
| JES | C | RPP#1 AIDS AWARENESS | 09-28-2011 | 09-28-2011 |
| JES | C | RPP#5 RELEASE REQUIREMENTS | 09-28-2011 | 09-28-2011 |
| JES | C | RPP 3 FINANCE | 09-28-2011 | 09-28-2011 |
| JES | C | RPP#2 DEPARTMENT OF LABOR | 09-28-2011 | 09-28-2011 |
| JES | C | RPP#4 COMMUNITY CORRECTIONS | 09-28-2011 | 09-28-2011 |
| JES | C | RPP#4 U. S. P. O. | 09-28-2011 | 09-28-2011 |
| JES | C | RPP#1 AIDS AWARENESS | 02-03-2011 | 02-03-2011 |
| FLP CHG | C | DISCOVERING ANCIENT WONDERS | 11-23-2009 | 02-16-2010 |
| FLP CHG | C | ABDOMINAL PM CLASS | 11-23-2009 | 01-13-2010 |
| FLP CHG | C | FILM CRITIC | 08-17-2009 | 11-09-2009 |
| FLP CHG | C | WELLNESS P.M. | 09-14-2009 | 11-05-2009 |
| FLP CHG | C | LEISURE | 07-01-2009 | 07-16-2009 |
| FLP | C | ACE UNIVERSE | 02-20-2008 | 05-05-2008 |
| FLP | C | TUESDAY 6-8PM | 11-12-2007 | 02-01-2008 |
| FLP | C | SPINNING CLASS | 10-16-2007 | 12-04-2007 |
| FLP | C | EARTH REVEALED ACE | 08-06-2007 | 10-17-2007 |
| FLP | C | LEISURE | 07-25-2007 | 10-01-2007 |
| FLP | C | RECREATION | 12-13-2006 | 03-29-2007 |
| FLP | C | WELLNESS A.M. | 09-29-2006 | 10-10-2006 |
| FLP | C | T-TH/2-3:00P | 05-23-2006 | 08-05-2006 |
| FLP | C | WELLNESS P.M. | 07-17-2005 | 09-20-2005 |
| FLP | C | WALKING/RUNNING | 07-21-2005 | 09-20-2005 |
| FLP | C | LEISURE | 05-15-2003 | 08-15-2003 |
| FLP | C | LEISURE | 06-21-2002 | 08-21-2002 |
| FLP | C | LEISURE | 06-23-2002 | 08-21-2002 |
| FLP | C | WELLNESS OVER 35 | 03-03-2002 | 07-07-2002 |

# EXHIBIT C

### FSA Recidivism Risk Assessment (PATTERN 01.03.00)

Register Number:09032-085, Last Name:BARBEE

**U.S. DEPARTMENT OF JUSTICE**                                              **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 09032-085 | Risk Level Inmate....: R-MIN |
| Inmate Name | General Level......: R-MIN (-17) |
|   Last.........: BARBEE | Violent Level......: R-MIN (-4) |
|   First........: CHARLES | Security Level Inmate: MEDIUM |
|   Middle.......: HARRISON | Security Level Facl..: MEDIUM |
|   Suffix.......: | Responsible Facility.: TDG |
| Gender.........: MALE | Start Incarceration..: 11/04/1997 |

**PATTERN Worksheet Summary**

| Item | Value | General Score | Violent Score |
|---|---|---|---|
| Current Age | 70 | 0 | 0 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | TRUE | 5 | 7 |
| Criminal History Points | 1 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -2 | -2 |
| Drug Program Status | NoNeed | -6 | -3 |
| All Incident Reports (120 Months) | 0 | 0 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | 283 | 0 | 0 |
| Time Since Last Serious Incident Report | 283 | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 12 | -12 | -4 |
| Work Programs | 2 | -2 | -2 |
| | Total | -17 | -4 |

Assessment Date: 08/23/2022                                    (1)                          Assessment# R-2147025977

```
  TDGBZ  606.00 *      MALE CUSTODY CLASSIFICATION FORM      *      08-29-2022
PAGE 001 OF 001                                                      13:40:34
                         (A)  IDENTIFYING DATA
REG NO..: [09032-085]            FORM DATE: 04-07-2022          ORG: TDG
NAME....: BARBEE, CHARLES HARRISON
                                         MGTV: NONE
PUB SFTY: GRT SVRTY,SENT LGTH            MVED:
                         (B)  BASE SCORING
DETAINER: (0) NONE               SEVERITY........: (7) GREATEST
MOS REL.: 259                    CRIM HIST SCORE: (00) 1 POINT
ESCAPES.: (0) NONE               VIOLENCE........: (0) NONE
VOL SURR: (0) N/A                AGE CATEGORY...: (0) 55 AND OVER
EDUC LEV: (0) VERFD HS DEGREE/GED DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
                         (C)  CUSTODY SCORING
TIME SERVED.....: (5) 76-90%     PROG PARTICIPAT: (1) AVERAGE
LIVING SKILLS...: (2) GOOD       TYPE DISCIP RPT: (5) NONE
FREQ DISCIP RPT.: (3) NONE       FAMILY/COMMUN..: (4) GOOD


                    --- LEVEL AND CUSTODY SUMMARY ---

BASE CUST VARIANCE  SEC TOTAL  SCORED LEV MGMT SEC LEVEL  CUSTODY  CONSIDER
+7   +20    -4        +3       MEDIUM        N/A            IN      DECREASE


G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

# EXHIBIT D

- ■ nn.    Removing "12812" and adding in its place "12117";

- ■ oo.    Removing "12813" and adding in its place "12118";

- ■ pp.    Removing "12814" and adding in its place "12119"; and

- ■ qq.    Removing "12815" and adding in its place "8296".

Note: The text of Part IIC of Form X–17A–5 does not and this amendment will not appear in the Code of Federal Regulations.

Dated: February 2, 2022.

J. Matthew DeLesDernier,

*Assistant Secretary.*

[FR Doc. 2022–02552 Filed 2–10–22; 8:45 am]

BILLING CODE 8011–01–C

---

## DEPARTMENT OF JUSTICE

## Bureau of Prisons

## 28 CFR Part 523

[BOP–1032–F]

RIN 1120–AA62

## Good Conduct Time Credit Under the First Step Act

**AGENCY:** Bureau of Prisons, Justice.

**ACTION:** Final rule.

**SUMMARY:** The Bureau of Prisons (Bureau or BOP) modifies regulations on Good Conduct Time (GCT) credit to conform with legislative changes under the First Step Act (FSA). The changes made by the FSA to the process for awarding GCT credit have resulted in recalculation of the release date of most inmates. This final rule adopts the same calculation method set forth in the proposed rule published on this subject, and finalizes that proposed rule with the following minor change(s) described below.

**DATES:** This rule is effective March 14, 2022.

**FOR FURTHER INFORMATION CONTACT:** Sarah N. Qureshi, Rules Administrator, Office of General Counsel, Bureau of Prisons, phone (202) 353–8248.

**SUPPLEMENTARY INFORMATION:**

## I. Overview

In this document, the Bureau modifies regulations on GCT credit to conform with changes made in the First Step Act of 2018 (FSA), Public Law 115–391, December 21, 2018, 132 Stat 5194. The Bureau published a proposed rule on this subject on December 31, 2019 (84 FR 72274) with a comment deadline of March 2, 2020. Seventy-four comments were received during the comment period. Six of those 74 comments supported the proposed rule without qualification. The remaining 68 comments raised some common issues, which we address below.

## II. Background.

Section 102(b) of the FSA amended 18 U.S.C. 3624(b) to provide that inmates may receive up to 54 days of GCT credit for each year of the sentence imposed by the court, instead of for each year of actual time served. *See* 18 U.S.C. 3624(b)(1) ("[A] prisoner who is serving a term of imprisonment of more than 1 year other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court . . ."). As a practical matter, prior to this change, awarding GCT credit for each year of actual time served had routinely resulted in a de facto cap of roughly 47 days per year of GCT credit. *See Barber v. Thomas,* 560 U.S. 474, 479 (2010). This final rule supports the FSA's modification of the GCT credit determination, which will result in recalculation of the release dates of most current inmates (with the exception of those serving sentences for offenses committed before November 1, 1987, sentences of one year or less, and sentences of life imprisonment).

Under section 102(b)(2) of the FSA, this change to the manner in which GCT credit is applied could not be made effective until the Attorney General completed and released a recidivism risk and needs assessment system, which was done on July 19, 2019. A total of 3,163 inmates were released from Bureau custody on July 19, 2019, after the Bureau recalculated release dates under the amended GCT credit scheme in the FSA.

The Bureau has completed the process of recalculations for the remainder of the inmate population, prioritizing recalculations by proximity of projected release dates, and releasing inmates as appropriate. This rule focuses primarily on the proper calculation of GCT credit for the last chronological year of an inmate's term of imprisonment, implementing the statutory instruction that "credit for the last year of a term of imprisonment shall be credited on the first day of the last year of the term of imprisonment." 18 U.S.C. 3624(b)(1). The Bureau has applied this calculation method since July 19, 2019, and the calculation method is the same one set forth in the Bureau's proposed rule.

## III. Discussion of Comments and BOP's Responses

*Comment: The Bureau should choose the second alternative described in the proposed rule instead of the third alternative proposed by the Bureau.* Sixty-four commenters urged the Bureau to adopt "Alternative 2," the alternative interpretation of the FSA described in the proposed rule that would offer "the most Good Conduct Time credit possible." To explain Alternative 2, we first provide some brief background.

Previously, 18 U.S.C. 3624(b)(1) provided that inmates "may receive credit toward the service of the prisoner's sentence beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term." The statute then specified that "credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence."

Section 102(b)(1) of the FSA, however, amended 18 U.S.C. 3624(b)(1) to require that inmates serving a sentence (other than a life sentence) of more than a year receive GCT credit of "up to 54 days for each year of the prisoner's sentence imposed by the court"—as opposed to for "time served"—and that GCT "credit for the last year of a term of imprisonment . . . be credited on the first day of the last year of the term of imprisonment."

In the proposed rule, the Bureau discussed three possible interpretations of the FSA's changes to 18 U.S.C. 3624(b)(1):

*Alternative 1:* The Bureau should award no GCT credit for any portion of a sentence imposed that is less than 12 months (*i.e.,* the Bureau should award no credit for any partial-year portion of the sentence imposed).

*Alternative 2:* The Bureau should award a full 54 days of GCT credit for *any partial* final year of the sentence imposed.

*Alternative 3:* The Bureau should award prorated credit for any partial final year of the sentence imposed.

As stated above, sixty-four commenters urged the Bureau to adopt Alternative 2, because the commenters felt it would offer "the most Good Conduct Time credit possible." [1]

The Bureau offers the following explanations of the alternative interpretations of the changes made to the GCT credit statute in the FSA, in order to clarify the issues raised and explain why Alternative 3 remains the most logical and equitable option.

*Alternative 1*

The revised section 3624(b)(1) directs the Bureau to award GCT credit for "the last year of the term of imprisonment." 18 U.S.C. 3624(b)(1). The FSA removed language from the statute which had instructed the Bureau to prorate GCT credit "for the last year or portion of a year," it could be argued that this deletion means that if an inmate has any part of his her or sentence that is less than 12 months, he or she earns *no* GCT credit for that portion of the sentence.

This interpretation, however, would ignore Congress's apparent intent to award credit for the full "sentence imposed." *See id.* Congress amended section 3624(b)(1) following the Supreme Court's decision in *Barber* v. *Thomas,* which interpreted the provision to allow GCT credit based on the time actually served, rather than the sentence imposed. 560 U.S. at 483. The practical effect of that decision, as noted above, was to place a cap of roughly 47 days per year of GCT credit. *Id.* at 479. The FSA abrogated that holding, amending section 3624(b)(1) to expressly tie GCT credit to the "sentence imposed," 18 U.S.C. 3624(b)(1), thereby "allowing prisoners to earn 54 days of credit per year, rather than 47 days." 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018).

[1] Fifty-four of the comments were two-word to two-sentence online responses, simply indicating support for Alternative 2.

Under Alternative 1, any inmate whose sentence imposed was not a whole number of years would earn GCT credit at a rate of less than 54 days per year. An inmate sentenced to 2.9 years, for instance, would receive 108 days of credit (54 days for each of the first 2 years), or an average of roughly 37 days of GCT per year. That is the kind of result Congress sought to avoid by amending section 3624(b)(1), and for that reason, the Bureau stated in the proposed rule that this interpretation is erroneous, unfair, and contradictory to Congressional intent. No commenters questioned the Bureau's rejection of this interpretation.

*Alternative 2 vs. Alternative 3*

Under both Alternative 2 and Alternative 3, inmates earn 54 days of GCT for each full year of the sentence imposed. For sentences that include a partial year, Alternative 2 would require the Bureau not to prorate GCT credit for the final partial year of the imposed sentence, but rather to award a full 54 days of GCT credit for that final partial year. The Bureau does not believe that this interpretation of the statute—under which 54 days of credit would be awarded to an inmate regardless of the length of the sentence imposed—would be fair or appropriate or reflects accurately the statutory text regarding calculation of GCT credit.

Instead, the Bureau adopts the Alternative 3 interpretation described in the proposed rule, under which it awards prorated credit for any partial year in an imposed sentence.

The Bureau's interpretation follows from the text of the statute, which directs that BOP award up to 54 days for "each *year*" of the sentence imposed, rather than for each *year or partial year* of an inmate's sentence. 18 U.S.C. 3624(b)(1) (emphasis added). The best way to effectuate that statutory command is to prorate, ensuring that an inmate receives "up to 54 days"—but no more—"for each year" imposed by the court and partial credit for partial years at the end of the sentence imposed by the court. *See id.* This has the effect of maintaining the maximum rate at which inmates can earn GCT credit at 54 days per year, as directed by the statute. Alternative 2, in contrast, would permit inmates to exceed this statutory rate. An inmate serving a sentence of 9 years and a day, for example, would receive 540 days of GCT credit—an average of nearly 60 days of GCT credit "for each

year of the prisoner's sentence imposed by the court." *Id.* The alternative would thus contravene the statutory command of awarding "*up to* 54 days for each year of the prisoner's sentence imposed by the court" by regularly awarding credit at a rate of *more* than 54 days per year. *Id.* (emphasis added).

To be sure, when Congress enacted the FSA to require calculating GCT credit by reference to the "sentence imposed by the court," it eliminated the express direction that the Bureau should "prorate[]" credit for the final "portion of a year of the term of imprisonment," *i.e.,* the final portion of the term served. The statute is now silent as to how the Bureau should calculate credit if the sentence imposed includes a final "portion of a year." The Bureau carefully considered that statutory history, but it ultimately concluded that any negative inference from Congress's deletion of the prior reference to prorating is insufficient to overcome the conflict with the current statute's text, which limits credit to "up to" 54 days of credit for the last year.[2]

That is especially so because Alternative 2 would lead to arbitrary, illogical, and unwarranted disparities among inmates. Under Alternative 2, inmates sentenced to more time would *systematically* secure an earlier release date than certain others sentenced to less time. Table 1 below illustrates the difference, and resulting inequities, in release dates under Alternative 2 and under Alternative 3, for a hypothetical inmate whose imprisonment term began on January 1, 2020.

[2] Indeed, Congress appears to have deleted the reference to "prorated" credit in the last sentence of section 3624(b)(1) not in an attempt to implicitly forbid prorating, but because that sentence no longer sets forth a special rule of calculation for the "last year of a term of imprisonment." Before the FSA, Congress directed the Bureau to calculate credit by reference to the "term of imprisonment"—a phrase that the Supreme Court held referred to time served, rather than the sentence imposed. *See Barber* v. *Thomas,* 560 U.S. 474, 483 (2010). The FSA abrogated that holding, amending the first sentence of section 3624(b)(1) to require the Bureau to calculate credit based on the "*sentence imposed by the court*" and to award up to 54 days for each year (including the last year) of a sentence imposed. The last sentence now addresses only when "credit for the last year of *a term of imprisonment*" should be awarded, not how credit for that last year should be calculated. 18 U.S.C. 3624(b)(1) (emphasis added). Because Congress no longer intended for the Bureau to calculate GCT based on the "term of imprisonment," Congress had no reason to retain the reference to prorating credit for the "last year of a term of imprisonment" in this sentence.

TABLE 1—APPLICATION OF GCT CREDIT UNDER ALTERNATIVES 2 AND 3

| | Sentence Imposed (prison term starting Jan. 1, 2020) | GCT credit for all full chronological years (54 days per year) | GCT credit for portion of last chronological year | Total GCT credit | Release date |
|---|---|---|---|---|---|
| ALT. 2: ........................ | 24 months ..................... | 108 | 0 | 108 | Sept. 14, 2021. |
| ALT. 3: | | | | | |
| ALT. 2: ........................ | 24 months + 1 day ............ | 108 | 54 | 162 | July 23, 2021. |
| ALT. 3: | | | 0 | 108 | Sept. 15, 2021. |
| ALT. 2: ........................ | 25 months ..................... | 108 | 54 | 162 | Aug. 22, 2021. |
| ALT. 3: | | | 4 | 112 | Oct. 11, 2021. |
| ALT. 2: ........................ | 26 months ..................... | 108 | 54 | 162 | Sept. 19, 2021. |
| ALT. 3: | | | 8 | 116 | Nov. 4, 2021. |
| ALT. 2: ........................ | 32 months ..................... | 108 | 54 | 162 | Mar. 22, 2022. |
| ALT. 3: | | | 35 | 143 | Apr. 10, 2022. |
| ALT. 2: ........................ | 36 months ..................... | 162 | 0 | 162 | July 22, 2022. |
| ALT. 3: | | | | | |
| ALT. 2: ........................ | 37 months ..................... | 162 | 54 | 216 | Jun. 29, 2022. |
| ALT. 3: | | | 4 | 166 | Aug. 18, 2022. |

As shown in the chart, under either alternative, an inmate sentenced to 24 months would receive a maximum of 108 days of GCT credit (54 days for each year) with a release date of September 14, 2021. Under Alternative 2, an inmate with a sentence of 24 months and one day would have an *earlier* release date of July 23, 2021. The Bureau would award 54 days of GCT credit for each of the two full years imposed, *as well as 54 days of credit for the additional single day,* resulting in a total of 162 days subtracted from his sentence to calculate his release date.[3] Alternative 3 avoids this unwarranted disparity and inequity: The Bureau would prorate credit for the final date of the inmate's sentence, leading to a maximum of 108 days of GCT credit.[3] That inmate would have a release date of September 15, 2021.

While courts might accept that inequitable result if Congress had expressly required it, an agency should generally seek to avoid introducing such anomalies in its interpretation of statutory text. *Cf. Validus Reinsurance, Ltd.* v. *United States,* 786 F.3d 1039, 1045–46 (D.C. Cir. 2015) (courts "must [ ] avoid statutory interpretations that bring about an anomalous result when other interpretations [are] available") (internal quotation marks omitted);

*Sturgeon* v. *Frost,* 139 S. Ct. 1066, 1080 n.3 & 1084 (2019) (declining to defer to an agency's interpretation that, though "grammatically possible," was inconsistent with statute's context).[4] In this case, it seems unlikely that Congress would have intended inmates sentenced to longer terms—often pursuant to Congress's statutory sentencing schemes—to, in fact, serve shorter sentences.

Alternative 3 is also most consistent with the premise behind GCT credit: Awarding sentencing credit for good conduct. In *Barber* v. *Thomas,* the Supreme Court interpreted the pre-FSA text of section 3624(b)(1) and explained that the "basic purpose" of the statute was to tie the award of GCT credits directly to good behavior during the preceding year of imprisonment. 560 U.S. at 482. Alternative 3 maintains that relationship, while Alternative 2 would award inmates the same amount of GCT credit despite being sentenced to (and serving) different amounts of time. For example, under Alternative 2, an inmate sentenced to 2 years and one day would receive the same GCT credit as an inmate sentenced to 3 years: A total of 162 days of GCT credit. Therefore,

Alternative 2 benefits an inmate with one day left to serve in the final year and another inmate with 365 days left to serve in the identical way, resulting in an unfair administration of the GCT benefit. Likewise, under Alternative 2, an inmate sentenced to 2 years and 1 day could misbehave for several days but still end up with more GCT credit than inmate who behaved perfectly but was sentenced to 2 years.

Some commenters believe that the Bureau incorrectly relied upon *Barber* in the proposed rule, noting that "several courts have found the FSA amendments to have 'effectively abrogate[d] *Barber* v. *Thomas.*'"[5] The Bureau agrees that the FSA abrogated *Barber's* holding that GCT credit should be based on time served rather than the sentence imposed. In doing so, Congress corrected a statutory ambiguity that resulted in inmates receiving a maximum of 47 days for each year imposed, and the Bureau's final rule reflects that change. At the same time, Congress retained the instruction that GCT credit only be awarded "subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance" with all relevant rules and laws governing inmate conduct. 18 U.S.C. 3624(b)(1). Congress thus retained the same underlying principle that GCT should

---

[3] Technically, the inmate would receive 108.188 days of GCT, but it is the Bureau's convention to round down any partial day of GCT to the nearest whole number. The Bureau does this because sentences are imposed in days, rather than hours, so the Bureau cannot award an inmate a partial day (*i.e.,* a few hours) of GCT. Nor can the Bureau round up to the nearest whole number, as that would result in an inmate being released before he has earned the requisite GCT credit.

[4] The statute does expressly create one such anomaly: The statute on its face applies only to inmates "serving a term of imprisonment of more than 1 year," 18 U.S.C. 3624(b)(1), which means that inmates sentenced to one year or less are not eligible for GCT credit. Accordingly, an inmate sentenced to one year and a day may well be released earlier than an inmate sentenced to a year. Alternative 2, however, would make that disparity even more pronounced, as it would allow an inmate sentenced to one year and a day to receive 108 days of GCT credit (rather than the 54 days received under the prorated option). It would also extend the disparity for sentences of all lengths.

[5] These commenters specifically cited *Hoenig* v. *United States,* 2019 WL 2006695 (N.D. Tex. May 7, 2019). Notably, however, the *Hoenig* court did not find that the Bureau's interpretation of the FSA was incorrect, but instead found that because the relevant statutory provisions had not yet taken effect, "the question of whether the BOP has erred in the calculation of Hoenig's sentence is premature and not yet ripe." *See id.* at *2.

have some relation to "exemplary compliance" with BOP rules. A natural reading of FSA-amended section 3624(b)(1) and adherence to the basic purpose of the statute support prorated credit for the last year of each inmate's imprisonment term.

Separately, some commenters assumed that section 3624(b)(1)'s "first day of the last year of the term of imprisonment" refers to the first day of the final calendar year of each inmate's imprisonment term. However, section 3624(b)(1) makes clear that credit for "*each year*" must be calculated using the length of sentence actually imposed by the court. 18 U.S.C. 3624(b)(1) (emphasis added). The Bureau thus calculates the maximum amount of GCT credit available, and the effective term to serve, based on the sentence imposed, and uses that number to calculate the number of full years ("anniversary periods") that an inmate will serve if he receives maximum GCT credit. Therefore, the "first day of the last year of the term of imprisonment" is the final anniversary date.

Since the publication of the proposed rule, courts have upheld the Bureau's general interpretation of how to calculate GCT credit under the FSA, though none have addressed the specific question at issue here. In *Chambers* v. *Ebbert*, for example, the court approved the Bureau's calculation of GCT credit after an inmate challenged the Bureau's assertion that less was earned due to the inmate's unsatisfactory progress towards earning a GED. The court stated that the inmate is "eligible, but not automatically entitled, to receive up to 54 days of good conduct time for each of his 15 years of imprisonment," and that the Bureau had engaged in a careful review of the "anniversary date for year-end sentence calculations." *Chambers* v. *Ebbert*, 2020 WL 555373 (M.D. Penn. Mar. 12, 2020). *See also Lewis* v. *Rios*, 2020 WL 555373 (D. Minn. Jan. 13, 2020); *United States* v. *Bowie*, 2019 WL 6464790 (D. Minn. Dec. 12, 2019); *United States* v. *Rivera*, 2019 WL 6464786 (D. Minn. Dec. 12, 2019); *Frazer* v. *Petrucci*, 2019 WL 5887302 (S.D.N.Y. Nov. 8, 2019).

==For the above reasons, the Bureau adopts the interpretation of the FSA and the method of calculation of GCT credit described in Alternative 3 of the== proposed rule.

*Comment: The rule is inequitable if an inmate receives a low-level sanction and GCT credit is withheld or denied.* One commenter was concerned that under the new regulation, GCT credit might be withheld if an inmate violates a "low-level" or low-severity prohibited act code under the current inmate

disciplinary regulations at 28 CFR part 541. That is not the Bureau's intention, and such a policy was not reflected in the proposed rule.

The proposed rule indicated that a sanction of forfeiture, disallowance, or withholding of GCT credit may only be imposed after the due process requirements described in 28 CFR part 541 as part of the inmate disciplinary process have been followed, and only if such a sanction is found to be appropriate for the severity level category of the prohibited act committed by the inmate.

The list of prohibited acts and corresponding available sanctions can be found in current regulations at 28 CFR 541.3 (Table 1—Prohibited Acts and Available Sanctions). Prohibited acts are divided into four categories based on severity: Greatest, High, Moderate, and Low. Each category is accompanied by a list of sanctions which may be imposed by the Bureau after an inmate is found to have committed a prohibited act in that category, following the appropriate due process procedures in 28 CFR part 541.

The proposed rule did not alter current procedures for the sanction of forfeiture, disallowance, or withholding of GCT credit for commission of prohibited acts, and the final rule likewise does not change the current system.

That said, the Bureau is committed to ensuring that the forfeiture, disallowance, or withholding of GCT credit for commission of prohibited acts—and the restoration of that GCT credit—is administered equitably across all individuals in all facilities. To that end, the Department of Justice will conduct and publish a demographic analysis over the past three years of (1) all prohibited acts that have led to the forfeiture, disallowance, or withholding of GCT credit; and (2) instances in which GCT credit was restored to determine whether any practices are leading to a disparate impact. This information will be part of the Bureau's evaluation whether a notice of proposed rulemaking regarding the classification of prohibited acts and their available penalties under the current inmate discipline program, codified at 28 CFR part 541, is warranted.

*Comment: Does the Bureau require a risk and needs assessment and a release plan as conditions for earning GCT credit?* Several commenters submitted comments regarding the Bureau's use of "risk assessments" under the FSA as a condition of earning GCT credit. One commenter asked whether inmates are required to undergo a "needs assessment" or have a "solid release

plan" as "conditions of obtaining" GCT credit, opining that if these requirements were imposed, recidivism rates would decrease tremendously. The commenter indicated that "the rule does mention that attending literacy classes or classes to obtain a GED would be one of the ways to earn credit[, as would] participating in any Bureau-authorized program. I am assuming the needs assessment falls under the Bureau-authorized program."

The commenter also noted that the FSA requires the Bureau to conduct inmate risk assessments, which the commenter suggested should help the Bureau to set programming goals for inmates, asking: "could participation [in] these assessment[s] be a mandated requirement to receiv[e] GCT credit[?] It sounds like it[']s up to the Bureau['s] discretion."

The commenter correctly interprets the FSA, but misunderstands the purpose of this rule, which is to explain how GCT credit will be calculated under the FSA. The changes to the method for calculating GCT credit are required by section 102(b) of the FSA, which amends 18 U.S.C. 3624(b) to indicate that inmates may receive up to 54 days of GCT credit for each year of the sentence imposed by the court, instead of for each year of actual time served.

The commenter is confusing the changes to GCT credit calculations mandated by section 102(b) of the FSA with FSA "Time Credits," which are authorized under section 101 of the FSA, and for which the Bureau will be publishing a separate rule. Broadly speaking, section 101 of the FSA provides that an eligible inmate in Bureau custody who successfully completes Evidence-Based Recidivism Reduction programs or Productive Activities may earn FSA Time Credits to be applied towards prerelease custody (*i.e.,* transfer to a Residential Reentry Center (RRC) or home confinement for service of a portion of the inmate's sentence) or early transfer to supervised release (*i.e.,* early satisfaction of the inmate's sentence) under 18 U.S.C. 3624(g). FSA Time Credits are not the same as GCT credits and will not be earned or applied in the same manner.

The commenter's confusion is understandable. Section 102(b)(2) of the FSA indicated that all the amendments made by section 102 (pertaining to GCT credits) could only take effect *after* the Attorney General completed and released the risk and needs assessment system described in section 101(a) (largely pertaining to FSA Time

**7942**    **Federal Register** / Vol. 87, No. 29 / Friday, February 11, 2022 / Rules and Regulations

Credits).[6] The Department of Justice publicly released this risk and needs assessment system on July 19, 2019. Therefore, in the proposed rule, we explained that the Bureau had already begun recalculating release dates due to the changes made by section 102(b) to the Bureau's GCT credit calculation method in anticipation of the July 19, 2019 release of the risk and needs assessment system.

Because explaining this point required a discussion of the release of the risk and needs assessment, the proposed rule may have given the impression that the risk and needs assessment was somehow connected to the process of calculating GCT credit, which is incorrect. The only connection between the risk and needs assessment and GCT credit is that the FSA conditioned the Bureau's implementation of the modified method of GCT credit calculation on the timing of the public release of the risk and needs assessment tool. Otherwise, as a practical matter, earning GCT credit is not predicated or conditioned upon any requirement that inmates have a plan for release or go through a risk assessment.

*Comment: The proposed rule would prevent elderly offenders eligible for home confinement from earning GCT.* One comment was comprised entirely of what appeared to be a reprint of an article or editorial entitled "Durbin, Lee Introduce Bill To Allow Nonviolent Elderly Prisoners Eligible For Release To Home Confinement To Benefit From Good Time Credit." The article had an explanatory subtitle: "The First Step Act Reauthorized And Expanded A Pilot Program To Place Elderly And Terminally Ill Inmates In Home Confinement, But BOP's Misinterpretation Of This Provision Will Result In Elderly Offenders Unnecessarily Spending A Longer Time Behind Bars Before Becoming Eligible For Release To Home Confinement."

This comment (including the article it reproduces) appears to refer to a bill passed in the House of Representatives on December 3, 2019 as H.R. 4018 and introduced in the Senate on December 12, 2019 as S.3035, the Elderly Home Detention Pilot Program Technical Corrections Act of 2019. The House Judiciary Committee Report accompanying this bill explains that H.R. 4018, a bill " '[t]o provide that the amount of time that an elderly offender must serve before being eligible for placement in home detention is to be

reduced by the amount of good time credits earned by the prisoner, and for other purposes,' would ensure that participants in the Second Chance Act elderly prisoner pilot program receive credit for good conduct time." H. Rept. 116–311, at 2 (2019).

The Bureau's current practice permits inmates who participate in the elderly prisoner pilot program to earn GCT credit, calculated with respect to their projected release date. The projected release date includes release from time in home detention or community confinement. S.3035 would not affect the Bureau's process for calculating GCT credit, but rather the determination of eligibility for elderly offender home confinement. The bill would provide that elderly offenders would become eligible for home confinement under the elderly offender pilot program if they had served two-thirds of their sentence as calculated based on their *projected release date* (which might be reduced by GCT credit), instead of their *full term of sentence* as imposed by the court. This new method of calculating eligibility for elderly offender home confinement would not impact an inmate's actual accrual or application of GCT credit in any way.

*Comment: The proposed rule will NOT make inmates eligible for the maximum of 12 months prerelease Residential Reentry Center (RRC) placement, contrary to the Second Chance Act's amendments to 18 U.S.C. 3624(c)(6)(C).* Section 3624(c)(6)(C) of title 18 requires the Bureau to ensure that community confinement placement is "of sufficient duration to provide the greatest likelihood of successful reintegration into the community." One commenter felt that the statute's requirement of "sufficient duration" should be interpreted to require the Bureau to afford qualifying inmates the maximum of 12 months of prerelease RRC placement.

As an initial matter, this comment does not address the proposed rule or the revised method of computing GCT credits under the FSA, and thus is not relevant to the final rule the Bureau issues today. Nonetheless, the Bureau notes that the commenter may have inadvertently overlooked the provisions directly before subparagraph (C). In subparagraph (A), the statute also requires the Bureau to ensure that community confinement is consistent with 18 U.S.C. 3621(b), which mandates that the Bureau designate each inmate to a place of imprisonment subject to a list of specific factors. The Bureau is specifically instructed by this statute to consider, for each designation determination, bed availability, the

specific inmate's security designation, programming needs, mental and medical needs, faith-based needs, sentencing court recommendations, security concerns, and proximity to the inmate's primary residence.

Additionally, the Bureau must also consider the resources of the facility, the circumstances of the inmate's offense, the inmate's history and characteristics, court statements regarding the purposes of the sentence imposed, and recommendations or relevant policies of the Sentencing Commission. Consideration of all these very specific factors necessarily requires a case-by-case determination, as required by the remainder of 18 U.S.C. 3624(c)(6)(B), which, after referring to the exhaustive list of required designation considerations in section 3621(b), further reinforces that the Bureau must make the determination of community confinement placement "on an individual basis." 18 U.S.C. 3624(c)(6)(B).

In the context of the full text of the statute, therefore, the commenter's assertion that 18 U.S.C. 3624(c)(6)(C) requires the Bureau to allow 12 months of community confinement in all cases, for all inmates, seems to be incorrect. This reading of the statute directly conflicts with the statute's mandate that the Bureau make this determination after a careful and thorough consideration of many factors on an individualized basis.

*Comment: With regard to literacy requirements, there should be several changes to the Bureau's education programs.* One commenter recommended specific ratios of GED, alternative literacy, and vocational training "tutors" per number of inmates, suggested that the Bureau provide payment and bonuses to inmates who tutor other inmates, and encouraged inmate placement in United States Department of Labor apprenticeship programs for teacher's aides. These recommendations will be taken under consideration by the Bureau and in consultation with Departments of Labor and Education, as appropriate, as it continues to develop inmate educational and vocational training opportunities.

*Change in terminology regarding immigrants in federal custody.* We make one minor change to conform with Executive Order 14012, *Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans,* issued on Feburary 2, 2021, and Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage*

---

[6] Section 101(a) amends 18 U.S.C. 3632(a) to require the Attorney General to consult with an Independent Review Committee, also authorized by the FSA, to develop a risk and needs assessment system.

*Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* issued on February 5, 2021. Those Executive orders use the term "noncitizen" in place of the terms "alien" or "illegal alien." Consistent with this representative change in terminology, and to promote accuracy, we likewise change the term "alien" in 28 CFR 523.20(d)(3) to "noncitizen" wherever it appears.

## Regulatory Analyses

*Executive Orders 12866 and 13563.* Because this rule may raise novel legal or policy issues arising out of implementation of the First Step Act, the Office of Management and Budget (OMB) has determined that it constitutes a "significant regulatory action" under section 3(f) of Executive Order 12866 and has reviewed it.

*Executive Order 13132.* This regulation will not have substantial direct effect on the States, on the relationship between the National Government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, under Executive Order 13132, we determine that this regulation does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

*Regulatory Flexibility Act.* The Director of the Bureau of Prisons, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), reviewed this regulation and by approving it certifies that it will not have a significant economic impact upon a substantial number of small entities for the following reasons: This regulation pertains to the correctional management of offenders committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

*Unfunded Mandates Reform Act of 1995.* This regulation will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Congressional Review Act.* This regulation is not a major rule as defined by the Congressional Review Act, 5 U.S.C. 804.

## List of Subjects in 28 CFR Part 523

Prisoners.

Michael D. Carvajal,
*Director, Federal Bureau of Prisons.*

Under rulemaking authority vested in the Attorney General in 5 U.S.C. 301; 28 U.S.C. 509, 510 and delegated to the Director, Bureau of Prisons, in 28 CFR 0.96, we amend 28 CFR part 523 as follows:

## PART 523—COMPUTATION OF SENTENCE

■ 1. The authority citation for 28 CFR part 523 continues to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161–4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006–5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

■ 2. Revise § 523.20 to read as follows:

### § 523.20   Good conduct time.

(a) The Bureau of Prisons (Bureau or BOP) awards good conduct time (GCT) credit to inmates under conditions described in this section. GCT credit may be reduced if an inmate:

(1) Commits prohibited acts which result in certain disciplinary sanctions (see part 541 of this chapter); or

(2) Fails to comply with literacy requirements in this section and part 544 of this chapter.

(b) For inmates serving a sentence for offenses committed on or after November 1, 1987:

(1) The Bureau will award inmates up to 54 days of GCT credit for each year of the sentence imposed by the court. Consistent with this methodology, the Bureau will initially determine a projected release date by calculating the maximum GCT credit possible based on the length of an inmate's imposed sentence. The projected release date is subject to change during the inmate's incarceration.

(2) The Bureau will award prorated credit for any partial final year of the sentence imposed, subject to the requirements in this section. Accordingly, BOP calculates the projected GCT credit to be awarded for any portion of a sentence that is less than a full year at a prorated amount.

(3) An inmate may receive up to 54 days of GCT credit on each anniversary date of his or her imposed sentence, subject to the requirements in this section. Credit for the last year of a term

of imprisonment is awarded the day after the end of the final "anniversary period," unless the final year is a complete year, in which case credit for the last year is awarded on the first day of the final anniversary period

(4) When the inmate reaches the Bureau-projected release date, the sentence will be satisfied and the inmate will be eligible for release.

(c) For inmates serving a sentence for offenses committed on or after November 1, 1987, but before September 13, 1994, GCT credit is vested once received and cannot be withdrawn.

(d)(1) For inmates serving a sentence for offenses committed on or after September 13, 1994, but before April 26, 1996, all GCT credit will vest annually only for inmates who have earned, or are making satisfactory progress toward earning, a high school diploma, equivalent degree, or Bureau-authorized alternative program credit (see part 544 of this chapter).

(2) For inmates serving a sentence for an offense committed on or after April 26, 1996, the Bureau will award:

(i) Up to 54 days of GCT credit for each year of the sentence imposed, applied on the anniversary date of his or her imposed sentence, if the inmate has earned or is making satisfactory progress toward earning a high school diploma, equivalent degree, or Bureau-authorized alternative program credit; or

(ii) Up to 42 days of GCT credit for each year of the sentence imposed, applied on the anniversary date of his/her imposed sentence, if the inmate does not meet conditions described in paragraph (d)(2)(i) of this section.

(3) Notwithstanding the requirements of paragraphs (d)(1) and (2) of this section, a noncitizen (inmate who is not a citizen of the United States) who is subject to a final order of removal, deportation, or exclusion, is not required to participate in a literacy program to earn yearly awards of GCT credit. However, such inmates remain eligible to participate in literacy programs under part 544 of this chapter.

[FR Doc. 2022–02876 Filed 2–10–22; 8:45 am]
BILLING CODE 4410–05–P

---

## DEPARTMENT OF THE TREASURY

### Office of Foreign Assets Control

### 31 CFR Part 554

### Burundi Sanctions Regulations

**AGENCY:** Office of Foreign Assets Control, Treasury.

**ACTION:** Final rule.

# EXHIBIT E

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

--------------------------------------------------------------------------------------------

FROM: 09032085
TO: Health Services
SUBJECT: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A
DATE: 07/21/2022 03:43:03 PM

To: Dr. Lawrence
Inmate Work Assignment: Unicor

Dr. Lawrence, I was on the callout today (Thursday 7/21) for the results of my x-ray from about ten days ago. There was no problem showing on the x-rays. When I questioned Mr. Fuller, who ordered the x-rays, he suggested that I get some Muscle rub from Commissary. When I explained to him through Mr. Halsey that I was still in a lot of pain even though I had been using muscle rub and Capsaicin cream for the past ten days in an attempt to get some relief and sleep, Mr. Fuller said that there was nothing they could do.
   I am suffering from a very bad dull ache in my left shoulder and arm. The arm is very weak and seems to be getting smaller than the other arm. I have numbness in three digits of my left hand. Certain movements like tying shoes, brushing teeth and looking upward seem to cause me a cramping pain in the area of my left scapula. I am not a person that seeks the assistance of the health services regularly and would appreciate a physicians assessment of my condition. Just telling there is nothing to be done seems a little crass in my view. This has been going on for three weeks now and is impeding my ability to sleep and perform my job properly. I feel the is possibly some nerve damage involved because of the numbness and certain movements of my neck. Thank you as always for taking the time to read and evaluate this letter.
                                                              RESPECTFULLY SUBMITTED

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

--------------------------------------------------------------------------------

FROM: Health Services
TO: 09032085
SUBJECT: RE:***Inmate to Staff Message***
DATE: 07/29/2022 09:12:02 AM

Lawrence, William (BOP)
Fri 7/22/2022 8:33 PM
To:

*

TDG-InmateToHealthSvcs (BOP)

You have at least 4 active consults right now with several already scheduled as medical trips for the near future. We should go ahead and get these finished first and then turn attention to this new problem if it doesn't resolve. In the meanwhile continue rest and OTC meds as needed  and come back to sick call if things get worse.


_____
From: ~^! BARBEE, ~^!CHARLES HARRISON <09032085@inmatemessage.com>
Sent: Thursday, July 21, 2022 8:43 PM
To: TDG-InmateToHealthSvcs (BOP) >
Subject: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A

To: Dr. Lawrence
Inmate Work Assignment: Unicor

Dr. Lawrence, I was on the callout today (Thursday 7/21) for the results of my x-ray from about ten days ago. There was no problem showing on the x-rays. When I questioned Mr. Fuller, who ordered the x-rays, he suggested that I get some Muscle rub from Commissary. When I explained to him through Mr. Halsey that I was still in a lot of pain even though I had been using muscle rub and Capsaicin cream for the past ten days in an attempt to get some relief and sleep, Mr. Fuller said that there was nothing they could do.
   I am suffering from a very bad dull ache in my left shoulder and arm. The arm is very weak and seems to be getting smaller than the other arm. I have numbness in three digits of my left hand. Certain movements like tying shoes, brushing teeth and looking upward seem to cause me a cramping pain in the area of my left scapula. I am not a person that seeks the assistance of the health services regularly and would appreciate a physicians assessment of my condition. Just telling there is nothing to be done seems a little crass in my view. This has been going on for three weeks now and is impeding my ability to sleep and perform my job properly. I feel the is possibly some nerve damage involved because of the numbness and certain movements of my neck. Thank you as always for taking the time to read and evaluate this letter.
                                                    RESPECTFULLY SUBMITTED

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

---------------------------------------------------------------------------------------------------------------

FROM: 09032085
TO: Health Services
SUBJECT: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A
DATE: 09/02/2022 03:24:53 PM

To: Dr. Lawrence - Medical
Inmate Work Assignment: Unicor

Early this morning(September 2, 2022) I was taken to Talladega for a Sonogram of my Thyroid gland. Upon arrival the
receptionist told the officers that my appointment had been scheduled for September 1, 2022, and that it had been cancelled. I
was taken back to the FCI but not able to get into Medical to find out why my appointment was cancelled and when, or if, it was
to be rescheduled. Can you shine any light of this situation? I am anxious to find out what I am facing concerning this issue of
Hyper-Thyroidism. I thank you for your care.          RESPECTFULLY SUBMITTED

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

---------------------------------------------------------------------------------

FROM: 09032085
TO: Health Services
SUBJECT: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A
DATE: 09/24/2022 11:53:06 AM

To: Dr. Lawrence - Medical
Inmate Work Assignment: Unicor

I have recently been experiencing swelling in my lower legs, most notably in the ankle/foot area of both legs. I have never received the Sonogram for the Thyroid issue, but recent medical issues make me wonder if these are related to the Hyper-Thyroidism issue that was indicated from the last two blood tests. I put in a sick call sign-up request yesterday(9/23). This is a request for your opinion as to how I should proceed.  RESPECTFULLY SUBMITTED

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

----------------------------------------------------------------------------------------------------

FROM: 09032085
TO: Health Services
SUBJECT: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A
DATE: 09/27/2022 08:30:26 PM

To: Medical Records - Ms. Garrett
Inmate Work Assignment: Unicor

Ms. Garrett in 2020 I had to obtain medical records for resentencing. You sent these records to my Attorney's email account. I am being resentenced again due to an appeal of the sentencing mentioned above. The attorney, Mark E. Vovos, has requested that I request the recent medical records since my return from the prior resentencing. This would be medical records from May 1st 2021 to the present date. Mr. Vovos' phone number is (509) 326-5220, if you would like to contact him. Mr. Vovos' email address is - mvovos@mvovos.digitalspacemail8.net

   Thank you so much for your help. Please send me a brief note so I will know that you received this request. My resentencing is scheduled by the Court for November 15, 2022 at 9:00am.
                                                            RESPECTFULLY REQUESTED

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

---------------------------------------------------------------------------------------------------

FROM: 09032085
TO: Health Services
SUBJECT: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A
DATE: 09/30/2022 05:10:08 PM

To: Medical Records
Inmate Work Assignment: Unicor

I sent a request to, Medical Records - Ms. Garrett, several days ago and have not received an acknowledgement. I am awaiting to be sent on a writ for resentencing and my attorney, Mark E. Vovos, has requested my medical records from May 2021 thru the date of this request. This time span will cover the medical records for the time since I last had medical records needed to satisfy legal needs for a resentencing January 25, 2021. Since Ms. Garrett has not responded I request that Health Services assign someone to make these records available to the lawyer mentioned above. Ms. Garrett email the last records to Mr. Vovos at the following email address - mvovos@mvovos.digitalspacemail8.net. Thank you!

                                                      RESPECTFULLY REQUESTED

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

--------------------------------------------------------------------------------------------------------

FROM: Health Services
TO: 09032085
SUBJECT: RE:***Inmate to Staff Message***
DATE: 10/03/2022 08:37:02 AM

Make sick call.
_____
From: ~^! BARBEE, ~^!CHARLES HARRISON <09032085@inmatemessage.com>
Sent: Sunday, October 2, 2022 11:55 AM
To: TDG-InmateToHealthSvcs (BOP) >
Subject: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A

To: Mr. Fuller - Medical PA
Inmate Work Assignment: Unicor

Since my appointment with you on 9/26 the water pills you prescribed have begun to reduce the swelling in my lower legs. I have been wearing the compression socks. I began the medications on the 27th. I also was notified on the 27th that the District Court in Spokane, Washington has ordered that I be resentenced 11/15/22, and that the Marshalls shall have me in Spokane on or before 10/31. That will mean that I will be in transit soon. I would like to have you prescribe a new blood pressure medication before I leave. Please let me know your thought on this. Thank you!

RESPECTFULLY SUBMITTED

TRULINCS  09032085 - BARBEE, CHARLES HARRISON - Unit: TDG-D-A

---------------------------------------------------------------------------------------------

FROM: Health Services
TO: 09032085
SUBJECT: RE:***Inmate to Staff Message***
DATE: 10/03/2022 02:27:02 PM

Lawrence, William (BOP)
?
?
?
?
?
To:

    *

TDG-InmateToHealthSvcs (BOP)

Mon 10/3/2022 3:44 PM
Although your thyroid levels T3 and T4 show in the normal range. the TSH (thyroid stimulating hormone) level remains high.
TSH is the human body's way to call for increased thyroid activity. When it goes high it usually means insufficient or too low
(hypo) thyroid activity. However, normal ranges for these numbers are arbitrary and may not correlate well for all situations with
different patients...

So to answer your question:  Yes, your symptoms could well be thyroid-related. I see where Mr. Fuller started the thyroid
supplement last week. If what we suspect is correct you should notice gradual improvement over the next few months.

_____
From: ~^! BARBEE, ~^!CHARLES HARRISON <09032085@inmatemessage.com>
Sent: Saturday, September 24, 2022 4:53 PM
To: TDG-InmateToHealthSvcs (BOP) >
Subject: ***Request to Staff*** BARBEE, CHARLES, Reg# 09032085, TDG-D-A

To: Dr. Lawrence - Medical
Inmate Work Assignment: Unicor

I have recently been experiencing swelling in my lower legs, most notably in the ankle/foot area of both legs. I have never
received the Sonogram for the Thyroid issue, but recent medical issues make me wonder if these are related to the Hyper-
Thyroidism issue that was indicated from the last two blood tests. I put in a sick call sign-up request yesterday(9/23). This is a
request for your opinion as to how I should proceed.  RESPECTFULLY SUBMITTED

# EXHIBIT F



**LOOSELY SWAGGER-RELATED**

JURISPRUDENCE

# This Chart Shows Why The Prison Population Is So Vulnerable to COVID-19

The prison population is graying.

BY WEIHUA LI AND NICOLE LEWIS

MARCH 20, 2020 • 4:26 PM



SkywardKick/iStock/Getty Images Plus

This investigation was published in partnership with the Marshall Project, a nonprofit news organization covering the U.S. criminal justice system. Sign up for their newsletters, or follow them on Facebook or Twitter.

As coronavirus spreads through Florida, Jack McFarland is urging officials at Madison Correctional Facility to prepare a separate dorm for himself and other older prisoners. At 64,

McFarland has spent the last 28 years in prison, and his age puts him at a higher risk of serious complications should he become infected.

The Sunshine State has more than 300 cases, and McFarland is worried about guards and staff bringing coronavirus into the prison. As the threat intensifies, he fears older people behind bars are being left to fend for themselves.

"They have no plans for us older guys," he wrote, using the prison's email system. "They don't care anything about your health. We older guys just have to take care of ourselves any way we can."

McFarland is one of a growing number of older people incarcerated across the country. The percentage of people in state prisons who are 55 and older more than tripled between 2000 and 2016, a Marshall Project analysis of data from the National Corrections Reporting Program found. Nearly 150,000 people incarcerated in state correctional facilities were 55 or older in 2016, the most recent year for which detailed data is available. For the first time, older adults make up a larger share of the state prison population than people from 18 to 24.

Similarly, 11 percent of the federal prison population—more than 20,000 people—is 56 or older, according to Bureau of Prisons data, which is collected separately from the state prisoner data.

## The Aging Population In State Prisons

Between 2000 and 2016, the percentage of people who are 55 or older has been consistently growing, reaching 12 percent in 2016. This means for the first time, the aging population in state prisons has surpassed the number of young adults between the age 18 and 24.



Source: National Corrections Reporting Program

Courtesy of The Marshall Project.

The risk of coronavirus to incarcerated seniors is high. Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination. To make matters worse, correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to suffer from chronic health conditions than the general public. As the virus spreads into the prisons, advocates and public health officials are urging corrections departments to release their aging prisoners.

Why are there so many older adults behind bars? Some scholars point to harsh sentencing laws imposed in the 1980s and 1990s as a factor.

Ned Benton, a professor of public management at the John Jay College of Criminal Justice, said the popularity of "tough on crime" politics led many statehouses to enact legislation such as three-strikes and "truth in sentencing" laws. Three strike laws significantly increased sentences for people convicted of felonies, and truth in sentencing measures made sure people stay in prison for a long time before they become eligible for parole.

Florida, for example, led the nation in 2016 with one of the highest percentages of aging prisoners. Roughly 13,600 people, or 14 percent of the state's prison population, were 55 or older, according to The Marshall Project's analysis. For decades the state has used

mandatory minimums and sentence enhancements to send people to prison for long stretches without the possibility of parole.

The Florida Department of Corrections said Thursday it is closely monitoring the spread of coronavirus, noting that there are currently no confirmed cases in the prison system. Should someone become infected, the department says it is "fully prepared to handle any potential cases."

What was lost in the national conversation of "tough on crime," Benton said, are the human and financial consequences of letting a generation of people grow old in prison. In 2016, a quarter of the oldest people in all state prisons were on death row or serving life sentences, and another quarter were serving sentences of 25 years or longer.

Research shows that seniors in prison have more health issues than their younger counterparts on the outside. They suffer more often from chronic health conditions such as hypertension and diabetes, and they're more likely to have limited mobility and increased mental health issues. The stress of prison life, coupled with a lack of access to quality medical care, means that many prisoners age faster than they would in the free world. By age 50, incarcerated people tend to suffer from health problems more commonly seen in people many years older.

These health conditions put them at greater risk of serious complications from  COVID-19. The majority of the more than 100 people who have died from the virus in the U.S. so far were over the age of 60. Nearly 30 of the deaths occurred at a nursing home in Kirkland, Washington. Though people of all ages have been hospitalized, scientists aren't entirely sure why the virus is more lethal for seniors. But they suspect older people's weakened immune systems and a higher rate of chronic health issues among the elderly play a part.

In prison, older people who require daily medications or more frequent care drive up medical costs. The annual cost of incarcerating people over 55 with a chronic or terminal illness is two to three times the cost for younger people, according to the National Institute of Corrections. Prison officials spent $8.1 billion on health care services in 2015, according to a report from Pew Charitable Trusts.

Brie Williams, a professor of medicine at the University of California, San Francisco, said prison systems cannot and should not weather the coronavirus crisis on their own. Health departments across the country, Williams said, should include prisons in their emergency planning.

"Prison healthcare systems generally function like outpatient clinics," said Williams, who specializes in correctional healthcare. "They have a minimum level of emergency medical equipment for a handful of people, but they don't generally have the really serious life support machines that are needed for people in profound respiratory distress."

In recent days, advocates have intensified their calls to release older prisoners. In a statement, the American Civil Liberties Union's Louisiana branch urged expedited parole hearings for the elderly in state prisons.

Several conservative criminal justice reform advocates are pressing lawmakers in the Senate to introduce emergency legislation that would reduce the age at which older federal prisoners become eligible for early release from 60 to 55, noting that's the "age at which recidivism rates drastically decline."

Similarly, the Prison Law Office, a California law firm that provides free legal services to people who are incarcerated, has asked the California Department of Corrections and Rehabilitation to release people who are medically vulnerable. The Marshall Project's analysis shows in 2016 nearly 18,000 people in the state's prisons were 55 or older.

When asked where people would go, the Prison Law Office's director Don Specter said, "better somewhere else than in a prison."

Rick Storm, 59, first heard about coronavirus while watching the news in Idaho State Correctional Institution. He says prison officials have suspended visitation and barred volunteers from entering, but they haven't provided any extra soap or cleaning supplies, and medical staff haven't circulated any information on what they'd do should someone in the facility test positive.

A spokesperson for the prison said that officials are "taking the threat posed by COVID-19 very seriously," noting they've ramped up efforts to ensure common areas are cleaned and sanitized.

Three of the state's eight confirmed cases of COVID-19 are in Ada County, where the prison is located. As the number of new infections grows, Storm's anxiety is rising.

"There is a lot of fear and uncertainty just like in the real world," Storm wrote to The Marshall Project, using the prison's email system. "Except in the real world you have a better chance of getting an answer or the proper medical treatment." ◢

*Additional reporting by Abbie VanSickle.*